UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GUY L. COULSTON JR., | Case No. 1:20-cv-00468-REP |
| Petitioner, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| LAWRENCE G. WASDEN, | |
| Respondent. | |

Petitioner Guy L. Coulston Jr. filed an Amended Petition for Writ of Habeas Corpus challenging his state court conviction. Dkt. 12. Respondent seeks dismissal of the Petition on procedural grounds. Dkt. 19. That motion is now fully briefed. Dkts. 24, 27.

All named parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. Dkt. 5. *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Upon review of the record, the Court concludes that Petitioner's claims are procedurally defaulted and, alternatively, under a de novo standard of relief, he is not entitled to relief on the merits of any claim.

## BACKGROUND

Petitioner asserts actual innocence of his Kootenai County criminal conviction of lewd and lascivious conduct with his step-daughter, A.R.M., a minor under sixteen years

**MEMORANDUM DECISION AND ORDER - 1**

of age. He faults his trial counsel for not doing more with the discrepancies in the minor victim's testimony, which allegedly demonstrate his innocence. He also faults his direct appeal counsel for not presenting particular trial errors to the state appellate courts.

Petitioner started out as kind of hero in A.R.M.'s life. Petitioner and A.R.M.'s mother, Millicent, had a relationship lasting several years, beginning when A.R.M. was three. Petitioner and Millicent had two daughters of their own during their relationship. Millicent temporarily left the family to take care of her aging parents for about a year until their deaths. At that point, Millicent decided she wanted a divorce, and she left all of her children, including 10-year-old A.R.M. (not Petitioner's natural child), with Petitioner. A.R.M.'s natural father was out of the picture.

Petitioner continued parenting alone, raising A.R.M. alongside his two much younger natural daughters. He relied on A.R.M. to do cooking, cleaning, and mothering tasks for her younger sisters, as she had done in the past. *See* State's Lodgings A-1, A-2, A-6.

A few weeks before A.R.M.'s eleventh birthday, Petitioner began to treat her as if she were his adult girlfriend. He told her this was okay because they were not related by blood. They began to have regular sexual encounters, including intercourse, which he called "love-ins." *See* State's Lodging A-6. In an interview with police investigator

**MEMORANDUM DECISION AND ORDER - 2**

Darrell Oyler, Petitioner agreed that this was the term they used; at trial he said, "I've never heard that word." State's Lodging A-2, p. 211.[1]

In his police interview, Petitioner asserted that A.R.M. initiated sex with him when she was 13 years old. He said he was "freaked out" when he awoke one night and found her on top of him." State's Lodging A-6. At trial, when asked whether he pushed her off, he replied, "No – well, yes." State's Lodging A-2, p. 210.

Petitioner told the investigator that after the first instance, no sexual contact occurred for some time, but eventually, A.R.M. wanted to have sex with him a couple of times a month, and so they had what he termed "consensual sex." *See id*.

The "love-ins" continued until A.R.M. was a high school sophomore. A.R.M. said that Petitioner told her they would run away together if she became pregnant. State's Lodging A-2, p. 102. When A.R.M. was 15, Petitioner put so many restrictions on what she could do in her free time, that she began to desire to end the entire relationship with Petitioner. *Id*. Also about that time, she realized that "parents don't have sex with their kids." State's Lodging A-1, p. 34. She said she let the sexual activity go on for four to five years because she was scared about what would happen to her younger sisters or where they would end up. State's Lodging A-2, p. 104.

---

[1] References to the trial transcript are to the Court's ECF docket pages, not the transcript pages, which are copied four to a page.

**MEMORANDUM DECISION AND ORDER - 3**

On a day when Petitioner required A.R.M. to come home right after school and miss her regular extracurricular activities, she was angry and confided in a close friend about the sexual conduct with Petitioner. *Id.*, p. 98. The friend encouraged her to go to the high school counselor and discuss the situation. A.R.M. said that she spoke to the school counselor because, in her words, "I got fed up with my home life and I didn't think I could handle it anymore. And I told them that particular day because I was scared to go home." *Id.*, p. 87. The counselor reported the situation to police. A.R.M reported to Detective Oyler that Petitioner had been verbally, physically, and sexually abusing her since the age of 10. State's Lodging A-1, pp. 23-25.

Detective Oyler decided to take the two younger girls into protective custody and had them picked up after school. The babysitter reported to Petitioner that the children did not arrive home. A.R.M. agreed to make a confrontation call to Petitioner. State's Lodging A-7. Petitioner did not deny the allegations of sexual activity A.R.M. made during the phone call, despite knowing that something was wrong, because he already knew the other two children had been intercepted by government officials. *See* State's Lodging A-1, pp. 32-34. Petitioner's conversation with A.R.M. was laced with profanity. *See* State's Lodging A-7.

**MEMORANDUM DECISION AND ORDER - 4**

Oyler asked Petitioner to come to the police department to meet with him. Petitioner was read his *Miranda* rights[2] and initialed a card showing that he acknowledged them. See State's Lodgings A-5, A-9. The investigator began by questioning Petitioner about whether he was physically and verbally abusive to his daughters. *See* State's Lodging A-6.

At about 28 minutes into the interview, Petitioner told Oyler: "Guess from here on out, cause I know you guys got your things, better talk to an attorney. I have no idea." Oyler continued questioning him without a pause. At about 36 minutes into the interview, Petitioner admitted to having had sex with A.R.M. State's Lodging A-6.

Petitioner's defense attorney, Rick Baughman, filed a pretrial motion to suppress, arguing that all statements made after Petitioner invoked his right to counsel must be suppressed. *See* State's Lodgings A-1, pp. 83-84; A-5, A-6. The district court held that Petitioner's request for counsel was ambiguous and denied his motion to suppress. *Id*., p. 99.

At trial, evidence was presented that corroborated A.R.M.'s story, such as specific sexual lubricants that A.R.M. had discussed with Oyler. Further, DNA evidence pointed to Petitioner as the perpetrator. *See* State's Lodgings A-2, A-10 through A-47.

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

**MEMORANDUM DECISION AND ORDER - 5**

The jury believed A.R.M.'s version of events. Petitioner was found guilty of lewd conduct with a minor under sixteen. State's Lodging A-1, p. 286. In a later proceeding, Petitioner was sentenced to a 35-year unified term of incarceration, with the first 15 years fixed. *Id.*, pp. 298-302.

The district court's denial of the motion to suppress was upheld on direct appeal. State's Lodgings B-5 to B-9. Petitioner obtained no relief on state post-conviction review. State's Lodgings D-1 to F-3.

## PRELIMINARY MOTIONS

### 1. Petitioner's Evidentiary Motions

Petitioner filed a "Motion for Inspecting the Entirety and Integrity of Sexual Assault Kit Inspection [sic]." Dkt. 11. The Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA) generally does not permit factual development on the merits of claims in federal habeas corpus actions. *See* 28 U.S.C. § 2254(e)(2)). However, that prohibition does not apply when bringing forward new evidence to show actual innocence to overcome procedural default, as here. *Dickens v. Ryan*, 740 F.3d 1302, 1320-21 (9th Cir. 2014) (en banc) (discussing *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011)).

A gateway actual innocence claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *House v. Bell*, 547 U.S. 518, 537 (2006). All

MEMORANDUM DECISION AND ORDER - 6

requests for habeas corpus discovery require a showing of "good cause." Rule 6(a) of the Rules Governing § 2254 Cases. In the context of a request for discovery on the merits of a claim, the United States Supreme Court has defined "good cause" as circumstances "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [or she] is ... entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908 (1997) (internal citation omitted). Where the petitioner meets this standard, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id.*

Petitioner raises reasons he should be permitted to develop the factual basis for his actual innocence claim: (1) that forensic scientist Rylene Nowlin testified at trial that some of the DNA swabs from the sexual assault kit and bloodstain sample of the victim were "missing"; (2) that the DNA evidence was manufactured; and (3) that there was a broken chain of custody. Petitioner provides little support in his motion.

Respondent has filed a response to the motion explaining in great detail how Petitioner has misunderstood the testimony at trial. Dkt. 20. That explanation is clear and tracks the trial transcript. *See* State's Lodging A-2, pp. 105-114. Based upon its review of the record and the arguments of the parties, the Court concludes that Petitioner is not entitled to develop further factual grounds for his actual innocence claim.

Analysis of sexual assault kits at the Idaho State Police Forensic Laboratory is a two-step process, as Rylene Nowlin, a bachelor's level forensic scientist with over ten

**MEMORANDUM DECISION AND ORDER - 7**

years of experience, explained at trial. First, a forensic scientist tests all items in the

sexual assault kit and creates samples of the victim's and, if available, the defendant's

DNA (from either blood or saliva). Not all items in the sexual assault kit will contain

DNA. The forensic scientist tests each item for DNA and removes those items that do

contain DNA from the sexual assault kit, along with the DNA samples from the victim

and defendant, and creates a DNA packet containing only the evidence containing DNA.

The forensic scientist then deposits the DNA packet (the smaller subset of the sexual

assault kit) at the "front of the laboratory" and turns custody of the packet over to the

staff there. State's Lodging A-2, p. 107. The receiving staff member puts the DNA packet

into a freezer in the lab's secure vault. *Id*. Later, a second forensic scientist will pick up

the DNA packet, analyze it, and prepare a report. *See id*., pp. 107-09.

Nowlin testified that, in this particular case, she tested each swab in the sexual

assault kit and removed the ones that had semen present, which were "all swabs, vaginal,

back and inner thighs" of the victim. *Id*., p. 107-09. She also took the liquid blood sample

from the victim and created a blood stain card. *Id*. at 107. She compiled a DNA packet

(the smaller subset of the sexual assault kit) and deposited it at the front of the lab. *Id*.

The sexual assault kit was not admitted at trial.

A second forensic scientist, Stacy Guess, a master's level forensic scientist with

nine years of experience at the Idaho State Police Forensic Services Laboratory, analyzed

the vaginal swab, the known sample bloodstain from the victim, and the known reference

**MEMORANDUM DECISION AND ORDER - 8**

swab Detective Oyler obtained from Petitioner. State's Lodging A-2, p. 109. After testing the vaginal swab and finding that it was 87 billion times more likely that the mixture of DNA came from the victim and Petitioner rather than the victim and another contributor, Guess did not analyze the swabs from the victim's back or inner thighs, as is her regular policy. *Id.*, p. 111. Guess later received additional evidence, the victim's underwear, and found that sperm on the underwear matched Petitioner's DNA profile. Guess testified that the likelihood that another person in the general population would match Petitioner's sperm found on the victim's underwear was 1 in 14 quintillion (14 followed by 18 zeroes). *Id.* Guess created a report showing the outcome of the testing. State's A-2, pp. 105-106.

As to Petitioner's first argument, the Court agrees with Respondent that Petitioner has misunderstood trial testimony. That the sexual assault kit samples that contained DNA were separated from samples that did not and placed into a subset of the kit called a DNA packet does not mean that the samples no longer exist, despite Nowlin using the term "missing." This argument is based on a mistake of fact.

As to Petitioner's second argument, there is no evidence in the record that the DNA evidence was fabricated. This argument is without factual or legal grounds. Petitioner mentions only that "Idaho State Police Forensic Laboratory in 2015 was found with over 300 sexual assault kits untested with statistics to the kits." Dkt. 11, p. 1. This argument generally is based on public news from the Idaho State Police that a 2016 audit

**MEMORANDUM DECISION AND ORDER - 9**

had revealed that there was a backlog of sexual assault kits that had never been tested. An

Idaho State Police news release from December 29, 2021, reported that the "final test

[from] all kits identified in the 2016 audit as needing to be submitted to the lab, or

already in the lab at that point, have now been completed, with reports provided to

investigators and prosecutors, and any hits in the National DNA Index System (CODIS)

provided to local law enforcement for further follow-up."[3] Petitioner has not made any

causal connection between the sexual assault kits that were not tested, and the victim's

kit, which was tested. Nor has Petitioner made any causal connection between the

nontesting of other kits and the work or credibility of the forensic scientists who testified

in his case.

　　　As to Petitioner's third argument—that Guess is not listed as a custodian on the

chain of custody for this evidence—the Court concludes that the record provides

sufficient evidence showing that Nowlin and Guess performed their analyses on the

correct samples, and that there is insufficient evidence of tampering in the record.

　　　Nowlin testified that it appeared the chain of custody had been maintained. *Id.*, p.

108. Nowlin identified Exhibit 3 and 4 as the turquoise-and-black striped panties and the

green panties from the victim. Nowlin could see her own taped seal and the tape seal of a

---

[3] The Court takes judicial notice of the existence of the news release. *See*
https://www.kpvi.com/news/local_news/after-5-years-of-work-idaho-state-police-completes-final-untested-sexual-
assault-kit/article_905fe868-6921-11ec-aebc-1b0b5d0f3817.html.

**MEMORANDUM DECISION AND ORDER - 10**

coworker on one of the items. She testified that, on both, there was no indication that the proper chain of custody was not followed. Newlin found semen on both pairs of the panties. *Id.*, pp. 108-09.

Guess testified that her date of analysis and initials were on Exhibit No. 3. She said that the container appeared to be in substantially the same condition as when it came to her, only it now had a chain of custody placed over the tape seal. *Id.* at p. 112. And, she testified, nothing would indicate that the chain of custody had not been followed. Id.

The DNA evidence repackaging is confirmed by Guess's written report, attached to his Amended Habeas Petition. Dkt. 12-5, pp. 11-12. That report shows that "[a] tape-sealed DNA Packet envelope, created in the laboratory on March 8, 2012," contained the allegedly "missing" items from the sexual assault kit at trial. Dkt. 12-5, p. 11. A break in the chain of custody is mere speculation on the part of Petitioner.

Alternatively, the Court agrees with Respondent that, even if the swabs and other items were missing from the kit or the packet at the time of trial, there is no other evidence suggesting that the experts' opinions were compromised—because the testing was completed long before trial.

In addition, even if a break in custody occurred, that would not have affected the admissibility of the experts' opinions. *See Dachlet v. State*, 40 P.3d 110, 114 (Idaho 2002) ("Generally, in laying a proper foundation for the admission of test results of a blood sample the practicalities of proof do not require the prosecution to negate all

**MEMORANDUM DECISION AND ORDER - 11**

possibilities of substitution or tampering," citing *State v. Gilpin*, 977 P.2d 905, 909
(Idaho Ct. App. 1999). Indeed, "the party offering the exhibit need not exclude all
possibility of tampering. Where the court is satisfied that in all reasonable probability the
article has not been changed in any material respect, the article is admissible into
evidence." *State v. Crook*, 565 P.2d 576, 577 (Idaho 1977).

The Court also agrees with Respondent that, even if this Court granted Petitioner
an opportunity to have the kit inspected, and the inspector found something missing, that
would not establish actual innocence, considering Petitioner's incriminating statements
during the staged confrontation call between the victim and Petitioner, his confession
during the interview with Detective Oyler, and the evidence found in Petitioner's
residence supporting A.R.M.'s testimony. *See* State's Lodging A-2, pp. 460-480.

Petitioner's sparse allegations that items are now missing from the sexual assault
kit (even if not currently contained in the DNA packet), that the DNA evidence was
fabricated, and that the chain of custody of the DNA evidence was broken do not meet
the standard for a showing of actual innocence—that "it is more likely than not that no
reasonable juror would have convicted him in light of the new evidence." S*chlup v. Delo*,
513 U.S. 298, 327 (1995). The Court does not have reason to believe that, if Petitioner is
permitted to have an expert review the DNA packaging and swabs, he may be able to
demonstrate that he is entitled to relief. This is not a situation where a stranger sexually
assaulted a victim and the identity of the perpetrator might be called into question.

**MEMORANDUM DECISION AND ORDER - 12**

Rather, both Petitioner and the victim admitted they had sexual intercourse on the Sunday before Petitioner's arrest, and the results of the DNA testing reflects their admissions. For all of these reasons, the motion to conduct discovery will be denied.

### 2. Extensions of Time

Respondent requested two extensions of time to file the Reply in support of the Motion to Dismiss. Good cause appearing, the motions will be granted, and the Reply is considered timely.

## REVIEW OF MOTION TO DISMISS

Respondent contends that all of Petitioner's claims are procedurally defaulted because none were presented to the Idaho Supreme Court in a proper manner. Because it is now too late for Petitioner to go back to state court to engage in proper exhaustion, Respondent requests that all of the claims be dismissed with prejudice.

### 1. Standards of Law

#### A. *Exhaustion Requirement*

A petitioner must "properly exhaust" his state court remedies before pursuing a claim in a federal habeas petition. 28 U.S.C. § 2254(b). That means "fairly presenting the claim" based on a federal theory to the highest state court for review in the manner prescribed by state law. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Unless a petitioner has properly exhausted his state court remedies for a particular claim, a federal

MEMORANDUM DECISION AND ORDER - 13

district court cannot grant relief on that claim, although it does have the discretion to deny the claim. 28 U.S.C. § 2254(b)(2).

State remedies are considered technically exhausted, but not *properly* exhausted, if a petitioner failed to pursue a federal claim in state court and there are no remedies now available. *O'Sullivan*, 526 U.S. at 848. A claim may also be considered exhausted, though not properly exhausted, if a petitioner pursued a federal claim in state court, but the state court rejected the claim on an independent and adequate state law procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 731-732 (1991). If a claim has not been properly exhausted in the state court system, the claim is considered "procedurally defaulted." *Id*. at 731.

**B.** ***Exceptions to Procedural Default Bar***

Even if a claim is procedurally defaulted, Petitioner may qualify for an exception that permits the Court to hear the merits of his claims: "cause and prejudice" or "actual innocence." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The Court now explains those standards of law.

**i.** ***Traditional* Coleman *Cause***

Ordinarily, to show "cause" for a procedural default, a petitioner must prove that some objective factor external to the defense impeded his or his counsel's efforts to comply with the state procedural rule at issue. *Coleman*, 501 U.S. at 753. A defense attorney's errors that rise to the level of a violation of the Sixth Amendment right to

**MEMORANDUM DECISION AND ORDER - 14**

effective assistance of counsel may, under certain circumstances, serve as a cause to excuse the procedural default of other claims. *Carrier*, 477 U.S. at 488. However, an allegation of ineffective assistance of counsel will serve as cause to excuse the default of other claims *only* if the ineffective assistance of counsel claim itself is not procedurally defaulted or, if defaulted, a petitioner can show cause and prejudice for the default. *Edwards v. Carpenter*, 529 U.S. 446, 454 (2000).

A petitioner does not have a federal constitutional right to effective assistance of counsel during state postconviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 554 (1987); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993). As a result, the general rule is that any errors of counsel during a postconviction action cannot serve as a basis for cause to excuse a procedural default. *Coleman*, 501 U.S. at 752.

### ii. Martinez *Cause*

A limited exception to the *Coleman* rule was created in *Martinez v. Ryan*, 566 U.S. 1 (2012)—that inadequate assistance of post-conviction review (PCR) counsel (or a lack of counsel) "at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. To show ineffective assistance of PCR counsel, Petitioner must show that the defaulted ineffective assistance of trial counsel claims are "substantial," meaning that the claims have "some merit." *Id.* at 14. To show that each claim is substantial, Petitioner must show that trial counsel performed deficiently, resulting in prejudice, defined as a reasonable

**MEMORANDUM DECISION AND ORDER - 15**

probability of a different outcome at trial. *Id.*; *see Strickland v. Washington*, 466 U.S. 668, 695-96 (1984).

The *Martinez v. Ryan* exception applies only to defaulted claims of ineffective assistance of trial counsel; it has not been extended to other types of claims. *See Davila v. Davis*, 137 S. Ct. 2058 (2017) (holding that *Martinez* is not applicable to claims of ineffective assistance of direct appeal counsel); *Hunton v. Sinclair*, 732 F.3d 1124 (9th Cir. 2013) (holding that *Martinez* is not applicable to a defaulted *Brady* claim).

### iii.   *Prejudice*

A petitioner must show both cause *and* prejudice to excuse a procedural default. To show "prejudice," a petitioner must demonstrate "not merely that the errors [in his proceeding] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982).

### iv.   *Actual Innocence*

If a petitioner cannot show cause and prejudice for a procedurally defaulted claim, the Court can hear the merits of the claim if he meets the "fundamental miscarriage of justice" exception. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). A miscarriage of justice means that a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Carrier*, 477 U.S. at 496.

**MEMORANDUM DECISION AND ORDER - 16**

Actual innocence must be premised on "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 64, 623 (1998). Petitioner must support his allegations of constitutional error with new reliable evidence that was not presented at trial, *Schlup v. Delo*, 513 U.S. 298 (1995). For example, types of evidence "which may establish factual innocence include credible declarations of guilt by another, *see Sawyer v. Whitley*, 505 U.S. 333, 340 (1992), trustworthy eyewitness accounts, *see Schlup*, 513 U.S. at 331, and exculpatory scientific evidence, *see Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996).

The petitioner bears the burden of demonstrating that "in light of all the evidence, including evidence not introduced at trial, it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 327; *see also House*, 547 U.S. at 539. The standard is demanding and permits review only in the "extraordinary" case. *Schlup*, 513 U.S. at 327.

## 2. History of Claims presented to State Appellate Courts and Claims Presented in Amended Habeas Petition

Petitioner's direct appeal raised a single claim—that Detective Oyler violated Petitioner's Fifth Amendment rights when he continued to interrogate Petitioner after Petitioner questioned aloud whether he should consult an attorney. That ruling was upheld on appeal. *See* State's Lodgings B-1, B-5.

**MEMORANDUM DECISION AND ORDER - 17**

Petitioner pursued a first state post-conviction petition in 2016. After summary dismissal of his claims in the state district court, Petitioner pursued an appeal, raising two claims: (1) that the district court had a duty to inquire into an alleged conflict of interest between Petitioner and his privately-retained counsel, and (2) that his right to an open and public trial was violated when the trial court interviewed two members of the jury venire in the presence of counsel and Petitioner but not in the public courtroom. The Idaho Court of Appeals affirmed the district court's summary dismissal of both claims, holding that there is no such duty as to his first claim and that he should have raised his second claim on direct appeal. State's Lodging D-9.

Petitioner filed a second post-conviction action in state court in 2018. He raised five claims. He received no relief in the state district court. He filed a notice of appeal, but voluntarily dismissed his case in 2020, upon his belief that he had no access to the courts during the COVID-19 quarantine period. *See* State's Lodgings E-1 to F-3.[4] Thus ended Petitioner's state court matters related to his conviction and sentence.

In the Amended Petition for Writ of Habeas Corpus, Petitioner brings the following ineffective assistance of trial counsel and direct appeal counsel claims:

---

[4] There is nothing in the record to support an argument that Petitioner had no access to the Idaho appellate courts during COVID. Petitioner has not produced evidence that the prison refused to make filings or that the Idaho Court of Appeals refused to accept late filings or refused to grant motions for extension of time to make filings during the worst of the COVID pandemic. All courts continued to operate, albeit more slowly and under different conditions, during the COVID pandemic.

**MEMORANDUM DECISION AND ORDER - 18**

     1.1   Trial counsel Rick Baughman failed to file a motion to suppress Petitioner's coerced statements made to Detective Oyler during a police interrogation.

     1.2   Trial counsel did not object to the questioning of two potential jurors off record, Mrs. Leatham and Ms. Evans.

     1.3   Trial counsel should not have stipulated to the admission of DNA evidence admitted at trial.

     1.4   Trial counsel should have brought forward evidence that the victim said she contracted Chlamydia from Petitioner, but that Petitioner did not have Chlamydia.

     1.5   Trial counsel failed to impeach the victim with perjured testimony from the preliminary hearing and from her direct examination at trial and failed to file a motion for mistrial or motion for a new trial based on the victim's perjured testimony.

     2.1   Direct appeal counsel Eric Fredrickson and Sara Thomas failed to raise DNA evidence admissibility issues on appeal.

     2.2   Direct appeal counsel failed to raise the Chlamydia issues on appeal.

     2.3    Direct appeal counsel failed to raise the issue of the victim's perjured testimony on appeal.

Dkt. 12.

     The Court earlier dismissed Claim 2.4, that the state district court committed judicial misconduct during post-conviction proceedings when it failed to accept Petitioner's "Affidavit of Conflict." Dkt. 15, pp. 4-5. A federal habeas corpus action is

**MEMORANDUM DECISION AND ORDER - 19**

not the proper avenue to address errors in a state's post-conviction review process.

*Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989), *cert. denied*, 493 U.S. 1012 (1989).

### 3. Discussion of Failure to Present Claims to Idaho Supreme Court and Alternative Denial on the Merits

#### A. *Claim 1.1: Coerced Confession*

Claim 1.1 is that trial counsel Rick Baughman failed to file a motion to suppress Petitioner's "coerced statements" made to Detective Oyler during a police interrogation. Petitioner alleges that, during the interrogation, Oyler used Petitioner's children "as a weapon" to coerce inculpatory statements from him. Dkt. 12, p. 7. Based upon Oyler's vague implications that Petitioner would be better off cooperating if he wanted his children back, Petitioner alleges that he decided that Oyler would not arrest him if he falsely admitted to the sexual allegations. This was the defense theme used at trial.

Baughman signed an affidavit on September 6, 2017, stating his belief that he fell below the standard of care in his representation of Petitioner on the basis of this "coerced confession" claim. Baughman declared:

> [A]t the Jury Trial I should have sought and presented expert testimony on the issue of false confession. I did not do so because [sic] I felt that the video of Coulston's interrogation clearly showed that his statements were coerced and under duress."

Dkt. 12-2, p. 62.

**MEMORANDUM DECISION AND ORDER - 20**

Petitioner exhausted a related but different claim on direct appeal—the underlying claim that Detective Oyler violated his Fifth Amendment *right to counsel* when he continued to question Petitioner after he said, "I better talk to an attorney. I have no idea." (*See* State's Lodging B-1.) Presentation of that claim did not exhaust the present claim, which is based on coercion, a different legal theory, with an ineffective assistance of counsel overlay.

This particular claim should have been presented in the first post-conviction petition. It was not, and it was never presented to the Idaho Supreme Court in any collateral review action. As cause for the default, Petitioner asserts that his post-conviction counsel was ineffective for failing to present it, given his trial counsel's admission of deficient performance, and that the *Martinez v. Ryan* exception should be applied to allow the Court to hear the merits of the claim de novo.

The Court reviews the claim to determine if it is "substantial" under *Martinez*. The *Martinez* court described "substantial" as having "some merit." 566 U.S. at 14 (analogizing to *Miller–El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue). The Court alternatively reviews this claim de novo on the merits to determine whether there was prejudice to Petitioner's defense. The merits review standard is a higher standard than the *Martinez* prejudice prong ("no" merit versus "some" merit).

**MEMORANDUM DECISION AND ORDER - 21**

The clearly-established law governing a Sixth Amendment claim of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on an ineffective assistance claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and that (2) the petitioner was prejudiced by the deficient performance. *Id*. at 684.

In assessing trial counsel's performance under *Strickland*'s first prong, a court must view counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

In assessing prejudice under *Strickland*'s second prong, a court must find that, under the particular circumstances of the case, there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

To review whether counsel performed deficiently, the Court begins with the substantive law that underlies the alleged deficiency. For this claim, it is clearly established that the use of an involuntary confession violates a criminal defendant's right to due process under the Fourteenth Amendment. *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960). The fact that Petitioner lost the right-to-counsel argument on direct appeal

**MEMORANDUM DECISION AND ORDER - 22**

does not foreclose a coerced confession claim. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry.").

A confession is coerced or involuntary if "the defendant's will was overborne at the time he confessed." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). Coercion can be mental or physical, but to render a statement involuntary, coercion must exist to such a degree that the statement is not "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *see also Blackburn*, 361 U.S. at 206.

In determining the voluntariness of a confession, the court must consider "the totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation." *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014). The "surrounding circumstances" of the confession are all relevant, including "the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, [and] the diverse pressures which sap or sustain his powers of resistance and self-control." *Id*. Other factors include the defendant's maturity and education. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court described how investigators are trained to use psychological ploys:

**MEMORANDUM DECISION AND ORDER - 23**

> To highlight the isolation and unfamiliar surroundings, the manuals instruct the police to display an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details. The guilt of the subject is to be posited as a fact. The interrogator should direct his comments toward the reasons why the subject committed the act, rather than court failure by asking the subject whether he did it. Like other men, perhaps the subject has had a bad family life, had an unhappy childhood, had too much to drink, had an unrequited desire for women. The officers are instructed to minimize the moral seriousness of the offense, to cast blame on the victim or on society. These tactics are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty. Explanations to the contrary are dismissed and discouraged.

*Id*. at 450.

*Martin v. Wainwright*, 770 F.2d 918 (11th Cir. 1985),[5] addressed a situation like Petitioner's, where investigators informed the defendant that cooperating would be beneficial to him. *Id*. at 924–27. In pretrial proceedings, Martin challenged the voluntariness of his confession obtained during a five-hour interrogation in which the United States Attorney participated. Martin alleged several aspects of coercion: (1) the police denied his request to postpone the interrogation one day; (2) the three interrogators used a "good guy, bad guy" technique; (3) one detective falsely told Martin that his codefendant had confessed; (4) the United States Attorney promised to get Martin

---

[5] *Martin* was modified on other grounds by 781 F.2d 185 (11th Cir.), *cert. denied*, 479 U.S. 909 (1986).

psychiatric help; and (5) the United States Attorney told Martin that while a confession would hurt him in the guilt phase of his bifurcated trial, it might help him in sentencing, and admonished that "only the truth can help you." *Id*. Under these circumstances, the Eleventh Circuit found that, although such tactics were distasteful, their cumulative effect was not sufficiently coercive to overbear Martin's will. *Id*. at 926.

In *Lynumn v. Illinois*, 372 U.S. 528 (1963), addressing a circumstance involving investigator threats to disrupt the defendant's relationship with her children, the Supreme Court found that the totality of circumstances amounted to coercion:

> [T] the petitioner's oral confession was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not "cooperate." These threats were made while she was encircled in her apartment by three police officers and a twice convicted felon who had purportedly "set her up." There was no friend or adviser to whom she might turn. She had had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats.
>
> We think it clear that a confession made under such circumstances must be deemed not voluntary, but coerced.

372 U.S. 528, 534 (1963).

Similarly, in *Brown v. Horell*, 644 F.3d 969 (9th Cir. 2011), the confession was deemed coerced where "the connection between Brown's truthfulness and Brown's ability to be with his girlfriend and child was a major, if not the dominant, theme running

**MEMORANDUM DECISION AND ORDER - 25**

throughout [the investigator's] interrogation." *Id*. at 980. The court described the tactics

of Ms. Overall, a polygrapher from the attorney general's office, as follows:

> Overall suggested she could pack up and go home. She
> told [Brown], The "only reason I'm talkin' to you is cuz you
> got a baby on the way, and I'd like to see you get to be with
> that baby, and these [detectives] have got a case they have to
> work." [Brown] said, "I wish I could be there for my baby."
> Overall responded, "I want to see you be there for your
> baby.... I can't get your side of what happened out there if you
> don't tell me. Do you want me to go get them? Do you want
> to let it go down like this? Or do you want to do the right
> thing for yourself, for your girlfriend and for your baby?"
> [Brown] repeated that he wanted to "be able to see the baby
> born." Overall said, "Okay. I want—I want that, too....
> [¶][W]e need to tell them that. I can't go out there and talk to
> them for you if you're not going to tell me what happened."
> [Brown] continued to deny he had a firearm or shot Cheryl.

*Id.* at 976.

In Petitioner's case, the video interview was about 54 minutes long. *See* State's

Lodging A-6. Detective Oyler was respectful, quiet, kind, and slow in his questioning.

Petitioner's demeanor was likewise quiet, respectful, and contemplative, with a few

exclamatory outburts. A written summary of the video interview is attached to this Order

as Appendix A.

The record reflects that Petitioner was approximately 31 years old. Petitioner's

counsel described him as "not an extremely highly educated man" (State's Lodging A-2,

p. 15), but Petitioner expressed himself thoughtfully and intelligently in the interview.

**MEMORANDUM DECISION AND ORDER - 26**

State's Lodging p. 6. He generally drove trucks for a living and was attending trade school to learn diesel engine mechanics. *Id*.

At 39 minutes into the interview, the following colloquy occurred:

Petitioner:     Well, I guess my next question is, you're not going to stop here, Detective, where do we go from here?"

Oyler:          Right, we're at talking. Except we got a process and part of the process is collecting DNA evidence, and it's time consuming, because once you collect it and send it to the lab, it sits down there for months and months and months and months.

                It depends on if you want to play ball or not. Do you want to work with us through this? I meant, is this something where you want your kids back? Do you want to, you know, go easy though this process or hard through this process. Do you want to sit in jail for three months while we are waiting from DNAs to come back?" Do you know what I mean?

Petitioner:     Yeah, but either way no matter what goes on, I'm going to jail anyway.

Oyler:          At this stage, yeah, I'm going to arrest you, I'm not going to lie to you. I'm going to arrest you. Unless you told me something that totally turned this thing around. Are you going to work with us or against us?

                I am going to arrest you today. Everything was in my mind leaning that way. Unless there's something I don't know. We don't know 100% 'til you come in the door. Are you going to work with us or against us?

Petitioner:     I'm going to work with you guys.

Appendix A, pp. 6-7; State's Lodging A-6.

**MEMORANDUM DECISION AND ORDER - 27**

At trial Petitioner testified that he thought Detective Oyler was going to let him pick up his other two daughters and go free if he falsely confessed to having sexual relations with A.R.M. Petitioner testified at trial about his thought processes during the interview: "I'm thinking now I'm going to have to more or less confess to something that I didn't do so I can get my kids back and go back home." State's Lodging A-2, p. 214.

However, Petitioner's trial testimony clearly is contrary to what he said in the interview. *See* Appendix A; State's Lodging A-6. In the interview, he asked questions, reasoned through his options, and drew his own conclusions from Oyler's comments about potential benefits of confessing. Importantly, Petitioner pointed out that the possibility of getting his kids back was incompatible with his 100% chance of going to jail immediately. *See id*.

At trial, defense counsel asked Petitioner: "Why did you feel compelled to admit to something you didn't do if you were already going to go to jail and you knew it?" Petitioner responded: "Because he gave me the option. In my head he gave me the option If I did something that I didn't do, admit to something that I didn't do, I would get my kids back. And that's exactly what he said." State's Lodging A-2, p. 228.

However, the fact that Petitioner himself recognized that Oyler's suggestion that Petitioner might get his kids back did not make sense because Petitioner knew he was going to jail immediately shows Petitioner's will was not overborne. Oyler's suggested benefits for cooperating were all extremely vague. There was never any clear indication

**MEMORANDUM DECISION AND ORDER - 28**

of what benefits Petitioner might receive if he "worked with" the government. The comment about the children was made once, 39 minutes into a 54-minute interview. The statement does not amount to the type of pressure that would "sap [one's] powers of resistance and self-control," as the Supreme Court put it in *Columbe v. Connecticut*, 367 U.S. 568, 602 (1961). Oyler's comment about getting the children back was insignificant and not psychologically oppressive as compared to the situations addressed in *Lynumn*, and *Brown*, above. The facts here are far less psychologically coercive, if at all, than in *Martin*, where the court labeled the detectives' false information and promises of benefits as "distasteful" but not enough to overcome the defendant's will.

In addition, the Court reviews whether Oyler exhibited any overtly oppressive treatment in the interview process that could be considered additional pressure to falsely confess. None appears evident in the video interview. See State's Lodging A-6. Petitioner testified several times that he did not feel threatened during the interview. At the suppression hearing, the following colloquy addressed potential coercion by Detective Oyler:

> Q.     He didn't threaten you at any time?
>
> A.     No.
>
> Q.     He was cordial with you?
>
> A.     He asked me questions like a normal person.
>
> Q.     Polite?

A.	Yeah. State's Lodging A-2, p. 14. And, at trial, Petitioner similarly stated that Detective Oyler never raised his voice with Petitioner, kept his voice at the same level throughout the interview, and wasn't threatening in a physical way. *Id.*, p. 221.

The Court concludes that the video recording, the preliminary hearing testimony, and Petitioner's trial testimony, together show that Petitioner was not coerced into confessing under the standard set forth in precedent. Regardless of Baughman's "admission" in his affidavit that he performed deficiently for not raising this issue in a motion to suppress, the Court finds that the record shows that no coercion occurred. Neither trial counsel nor post-conviction counsel performed deficiently in not raising the issue, and no prejudice occurred to Petitioner. Therefore, the *Martinez* exception does not apply to excuse the procedural default of this claim. Alternatively, the Court denies the claim on de novo review.

B.	*Claim 1.2*

Claim 1.2 is that Petitioner's trial counsel did not object to the questioning of two potential jurors off the record, Mrs. Leatham and Ms. Evans. Dkt. 12, pp. 8-9.

Petitioner brought the underlying substantive issue without the ineffective assistance of counsel overlay as a claim on post-conviction review, but the state district court determined that the claim was procedurally barred because he failed to object at trial and could have raised the claim on direct appeal. On appeal, the Idaho Court of

**MEMORANDUM DECISION AND ORDER - 30**

Appeals affirmed the district court on the procedural basis. State's Lodging D-9 p. 3. For federal habeas corpus purposes, that claim—whether asserted as the underlying claim or with an ineffective assistance of counsel overlay—is procedurally defaulted.

Regardless of the procedural default, the facts in the record show that there is no factual basis for this claim. The Sixth Amendment provides that criminal defendants are entitled to "a speedy and public trial." The right to "a public trial is for the benefit of the accused." *Waller v. Georgia*, 467 U.S. 39, 46 (1984). Defendants may waive the right to a public trial. *See Levine v. United States*, 362 U.S. 610, 619 (1960). Defendants forfeit their right to a public trial by failing to timely object to the closure of the courtroom during voir dire. *See Peretz v. United States*, 501 U.S. 923, 936, (1991); *Levine v. United States*, 362 U.S. 610, 619 (1960).

During voir dire, the state district court asked if any of the potential jurors desired to have discussions about their ability to be impartial in a more private setting, because of the sensitive topic of the criminal charge. Several desired to be questioned privately. The court then asked counsel and Petitioner whether they were willing to waive the right to a public forum for this particular questioning. After the Court informed Petitioner of the "right to have this type of questioning take place in the courtroom in front of the press," both counsel and Petitioner himself said they were willing to waive. State's Lodging A-2, p. 30. The transcript of the original proceeding shows that the court questioned the

**MEMORANDUM DECISION AND ORDER - 31**

potential jurors on the record with the prosecutor, Petitioner, and Petitioner's counsel present. *See* State's Lodgings A-2, D-7. p. 87.

The Court concludes that there is no merit to this claim. A public record was created for appeal during the in camera interview. Beyond the First Amendment issues, counsel's decision had positive effects on the proceedings. The potential jurors were more likely to be open without the presence of the other jurors and the public, making it clearer for counsel to determine whether to dismiss them. In addition, it was less likely that these jurors could have said something that might have tainted the entire jury panel. For all of these reasons, Petitioner has not shown deficient performance or prejudice from defense counsel's decision to agree to the in-camera questioning of these potential jurors.

### C. *Remaining Claims: Procedural Default*

The remaining claims in the Petition are procedurally defaulted because neither they, nor the underlying substantive claims, were presented to the Idaho Supreme Court. Because these claims are without merit, the Court will deny them under a de novo review standard.

> 1.3 Trial counsel should not have stipulated to the admission of DNA evidence admitted at trial, and 2.1 Direct appeal counsel Eric Fredrickson and Sara Thomas failed to raise DNA evidence admissibility issues on appeal.

Petitioner asserts that Baughman should not have stipulated to admission of the DNA evidence. He disagrees with Baughman's affidavit:

**MEMORANDUM DECISION AND ORDER - 32**

> "The decision to stipulate to admission of DNA evidence was
> strategic/tactical, as the evidence would likely have come in
> despite any challenge on behalf of Coulston and the
> opportunity to cross-examine remained. The decision also
> served to save Coulston a significant amount of money."

Dkt. 12, p. 11.

The last alleged sexual incident between Petitioner and the victim occurred on Sunday, November 26, 2011, and the testing was performed on November 29, 2011. Petitioner asserts that his DNA could not have been found on A.R.M.'s body after three days and two showers. Petitioner has not provided any scientific evidence showing that this proposition is accurate.

Further, the accuracy of the contested evidence is bolstered by Petitioner's admission to Detective Oyler that he last had sex with the victim on the previous Sunday and by the fact that the DNA from the victim's vagina and her underwear pointed to Petitioner's profile in a statistically-significant way. Baughman was not deficient in seeing the opportunity to decline a stipulation as an unhelpful avenue of defense. He appropriately made a tactical and strategic decision not to challenge the evidence. Nor was Petitioner prejudiced by the stipulation, because he has not shown any reason why the DNA evidence would have been excluded had Baughman objected to its admission. For the same reasons, direct appeal counsel was not ineffective.

**MEMORANDUM DECISION AND ORDER - 33**

<u>1.4 Trial counsel should have brought forward evidence that
the victim said she contracted chlamydia from Petitioner, but
that Petitioner did not have chlamydia, and 2.2 Direct appeal
counsel failed to raise the chlamydia issues on appeal</u>

Medical records of the victim from the dates in question show that the victim had

chlamydia, *see* State's Lodging E-2, but Petitioner did not. At the preliminary hearing,

the victim testified that she contracted chlamydia from Petitioner and found out when she

had the sexual assault examination done. State's Lodging A-49, pp. 23-24. Chlamydia is

a reportable disease, and Petitioner says that A.R.M. did not list Petitioner as a sexual

partner on the Idaho Department of Health reporting form.

Petitioner argues that Baughman performed deficiently because Petitioner should

not have been prevented from presenting evidence that he did not have chlamydia in his

rebuttal case. He argues that the absence of his name in the records proves that he never

had sexual intercourse with the victim.

Baughman declared by affidavit:

> Coulston and I disagreed regarding the value of the
> sexually transmitted disease (STD) evidence and testimony.
> Coulston stated that he wanted to present the evidence to
> attach the victim's credibility. I counseled him that the issue
> was not the STD, but rather, whether Mr. Couston actually
> penetrated the victim's vagina."

Dkt. 12-2, p. 10.

Petitioner argues that this was a decision that he, not counsel, should have made,

because it was not a strategic or tactical decision. Petitioner argues that an STD proves

**MEMORANDUM DECISION AND ORDER - 34**

that there was penetration into a vagina by a person who had chlamydia—and he does not fit that description.

Petitioner's reasoning behind his request is flawed. If, in fact, the records show that the minor victim did not list Petitioner as a sexual partner, it does not demonstrate anything more than the deductions that can be made from the current record: either that the minor victim lied several times about having sex with Petitioner, or that the minor victim had sex with Petitioner but tried to conceal that fact from other adults.

The omission of this evidence does not change the fact that Petitioner himself admitted to having sex with the minor victim and that Petitioner's DNA was found in her vagina and underwear. Counsel was not deficient for declining to make this evidence a part of the defense. Contrary to Petitioner's argument, this was a tactical decision. The jury was likely to see this issue as a red herring, because, as discussed directly above, the evidence does not preclude Petitioner as a person having sex with the victim; it merely suggests that another person (perhaps someone her own age) likely had sex with her. Because Idaho Rule of Evidence 412 precludes admission of evidence of a sexual assault victim's past sexual behavior, Baughman was not deficient in rejecting Petitioner's suggestion to attempt to bring this evidence forward at trial.

Petitioner was not prejudiced by it because of the strength of the evidence against him. Therefore, Baughman was not ineffective. For the same reasons, direct appeal counsel was not ineffective.

**MEMORANDUM DECISION AND ORDER - 35**

<u>1.5 Trial counsel failed to impeach the victim with perjured
testimony from the preliminary hearing and from her direct
examination at trial and failed to file a motion for mistrial or
motion for a new trial based on the victim's perjured
testimony, and 2.3 Direct appeal counsel failed to raise the
issue of the victim's perjured testimony on appeal</u>

Petitioner argues that A.R.M's whole testimony was called into question after her

"admitted perjured testimony" regarding whether she had oral sex with him. The

chronological facts underlying this claim are as follows.

During the police interview, A.R.M. denied having oral sex with Petitioner. *See*

State's Lodging A-1, p. 24. During the preliminary hearing, A.R.M. testified that they did

not engage in oral sex. State's Lodging A-49, p. 23.

However, at trial, A.R.M. testified:

> Q.    At no time was there oral sex?
>
> A:    No
>
> Q    At no time…
>
> A:    Yes, there was. I lied.
>
> Q.    Excuse me?
>
> A.    He had given me oral sex.
>
> Q.    Well, do you recall testifying at the preliminary
>        hearing that that absolutely did not happen?
>
> A.    Well, from what I remember, I didn't give him any
>        oral sex.

State's Lodging A-2, p. 97.

**MEMORANDUM DECISION AND ORDER - 36**

Under cross-examination, A.R.M. testified she did not recall what she told Detective Oyler about whether there had been any oral sex. She did not recall what she said at the preliminary hearing, stating: "I have blocked out a lot of stuff out of my memory, and I am just now remembering this." *Id*., p. 98. Also at trial, A.R.M. clarified that, at the preliminary hearing, she had been referring to the fact that she had not given him oral sex, but he had given her oral sex. *Id*., p. 97.

Petitioner asserts that the admission that A.R.M. lied means that she has no credibility, the State has no case, and Petitioner is innocent. Petitioner asserts that Baughman should have done more to highlight the discrepancies in A.R.M.'s versions of events at trial. He also asserts that defense counsel was ineffective for failing to either move for a mistrial or a new trial.

Even though this factual discrepancy seems like a very important matter to Petitioner, it is not when considered against the whole record. It was yet another credibility issue for the jury to decide when the jury weighed all of the other evidence in the record. There could be any number of explanations behind A.R.M.'s statement. It is very common modern vernacular for people to say, "I lied," when they circle back in conversation and correct something they said that was not accurate. It does not necessarily mean, "I intended to not be truthful," but may mean, "I need to correct something I said that was incorrect." Or, the jury could have inferred that A.R.M. was saying at trial that she was intentionally lying about having oral sex with Petitioner.

**MEMORANDUM DECISION AND ORDER - 37**

As to the preliminary hearing testimony, A.R.M. explained the discrepancy away by saying that her interpretation of the question had been different (which is understandable, given her young age). She explained away the investigation discrepancy by saying that she tried to block the sexual experiences from her memory (which was understandable, given the constant overlay of worries of what might happen to her and her sisters if she reported the sexual abuse). It was up to the jury to assess these explanations and find A.R.M. or Petitioner more credible, based on the totality of the evidence presented at trial.

Petitioner does not show what more counsel could have or should have done. In fact, his counsel's questioning that *was* done raised the issue of A.R.M.'s credibility with the jury in a subtle, non-offensive way. For tactical and strategic reasons, many defense attorneys are very careful to avoid being overly aggressive with child witnesses, because aggression can backfire and cause jurors to begin to feel sympathy for them. There is no deficient performance and no prejudice, because the discrepancies in A.R.M.'s testimony *were* raised at trial for the jury to consider. Had Baughman filed a motion for a mistrial or new trial, it would have been denied on the grounds that this was simply a credibility issue to be determined by the jury. This claim will be denied on the merits under a de novo review standard.

Petitioner also has combed through the record for other discrepancies in A.R.M.'s testimony. He is simply amiss in thinking that a jury is going to fault a 15-year-old for

**MEMORANDUM DECISION AND ORDER - 38**

not knowing the frequency she had sex with an adult over a four- to five-year period of time—beginning when she was ten years old. He also argues that he was a long-distance truck driver, and could not have had frequent sex with A.R.M.. However, testimony showed that during the last part of their "relationship," Petitioner was going to diesel mechanic school locally, as he told Detective Oyler. *See* State's Lodging A-6. A minor child is not going to be able to match up Petitioner's dates of employment or being on the road with the frequency of sex with a father figure when testifying about incidents that occurred between the time she was ten and fifteen. Any discrepancies as to these issues were not going to make a significant difference to the jury given the other strong evidence pointing to him as the perpetrator of the crimes.

Petitioner also asserts that Baughman could have done a better job of asserting that A.R.M. fabricated the sexual relationship story because she was angry with Petitioner for not allowing her to go to scheduled extracurricular activities and for requiring her to check in with him while she was away. However, counsel cross-examined A.R.M. adequately on this subject. State's Lodging A-2, p. 98.

Petitioner has not shown that trial counsel performed deficiently, nor has he shown prejudice to his case. The record reflects that Baughman adequately cross-examined A.R.M. and adequately raised her credibility issues in a manner that would not inflame the jury. He highlighted discrepancies in her various statements about the frequency of sex, whether he gave her a body massage, where Petitioner kept lubricating products, and

**MEMORANDUM DECISION AND ORDER - 39**

whether or not she told Detective Stinebaugh at the school that she was afraid to go home. *See* State's Lodging A-2, pp. 96-98.

Petitioner's suggested motions based on A.R.M.'s credibility issues would have been denied because there was no legal basis for filing such motions. Petitioner was not prejudiced by his counsel's decisionmaking regarding credibility issues of the witnesses. For all of these reasons, the Court concludes, under a de novo standard of review, that direct appeal counsel was not ineffective.

## SUMMARY

Petitioner's claims are procedurally defaulted for failure to properly present them to the Idaho Supreme Court. However, the Court has analyzed them on the merits as if they were not procedurally defaulted. None of the claims warrants granting a writ of habeas corpus. This case presents some of the strongest evidence the Court has seen in support of a lewd conduct conviction. Petitioner has not shown actual innocence. The Petition for Writ of Habeas Corpus will be denied and dismissed, and a Certificate of Appealability will not issue.

## ORDER

**IT IS ORDERED**:

1. The parties' Motions for Extension of Time (Dkts. 25, 26) are GRANTED.

2. Petitioner's "Motion for Inspection of Sexual Assault Kit" (Dkt. 11) is DENIED.

3. Respondent's Motion for Summary Dismissal (Dkt. 19) is GRANTED.

4.  The Petition for Writ of Habeas Corpus (Dkt. 1) is DENIED and DISMISSED with prejudice.

5.  The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED:  March 31, 2022

Honorable Raymond E. Patricco
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 41**